304 S.E.2d 312

**Betty J. LaRUE**

v.

**Walter F. LaRUE.**

No. 15578.

Supreme Court of Appeals of West Virginia.

May 25, 1983.

Concurring Opinion May 27, 1983.

Martorella & Martorella and Majorie Martorella, Huntington, Susan P. Moser, Wheeling, for appellant.

Bailey, Byrum & Vieweg and George B. Vieweg, III, Wheeling, for appellee.

Marsha Levick, Judith I. Avner, Anne E. Simon, New York City, for amicus curiae— The National Organization for Women Legal Defense and Education Fund and the National Center on Women and Family Law.

MILLER, Justice:

In this appeal from a final divorce action, we are asked to recognize the doctrine of equitable distribution of marital property. The trial court essentially held that the wife was not entitled to her claim for the equitable distribution of the marital assets. We conclude that the trial court erred.

The parties were married in 1950, and their marriage was a traditional one in the sense that Mr. LaRue exclusively handled the family's financial affairs and Mrs. La-Rue was mainly a homemaker. Their gross income in the last year of marriage, during which Mrs. LaRue did not work, was $43,000. Out of thirty years of marriage, Mrs. LaRue was employed only in the early years of the marriage, and her gross earnings over seven years totaled $51,000. Evidence was presented that Mr. LaRue encouraged his spouse to be a housewife and homemaker, and accordingly she raised two children, cared for the house and the comfort of her family, and entertained her husband's business associates.

A divorce was granted to the parties in March 1980, based on irreconcilable differences, following a period of eight to ten years of problems. The trial court found inequitable conduct on both sides, but concluded that Mr. LaRue's abusive conduct "far outweighed" that of his wife. As the parties' two children were grown, the divorce order awarded Mrs. LaRue only alimony and an allowance for health insurance. The divorce order did not provide for any distribution of the marital assets, and the parties were unable to agree on any division except as to some items of personal property. The appellant petitioned the circuit court to award her a one-half interest in all personal property owned by Mr. LaRue, an undivided one-half interest in all real estate owned by him, a conveyance to her of all real and personal property in the name of and under the control of Mr. La-Rue, and a reservation for Mrs. LaRue of a dower interest in the real property owned by Mr. LaRue. Mrs. LaRue's petition was denied, on the grounds that she had failed to carry the burden of proving either that a contract existed that marital assets were to be equally owned, or that any of her earnings were invested in any property titled in Mr. LaRue's name. The court found no grounds to establish a constructive trust in favor of Mrs. LaRue.

Early in the marriage, the parties had owned a home located on East Cove Avenue in Wheeling. The home, which had been titled in both names jointly, was sold for approximately $15,000 in 1962, and the proceeds were reinvested in another home, located on Elm Crest Drive in Wheeling. Prior to January 1972, that home was owned in the name of Mrs. LaRue only. At that time, Mr. LaRue had Mrs. LaRue sign a deed transferring title to his name only. The appellant did not recall signing the deed, but stated that she frequently signed papers at her husband's request without knowing their nature. The deed was signed at about the time when the marriage began to deteriorate, but was not recorded until November 1979, after the parties separated. Prior to bringing her petition for a division of the marital property, Mrs. LaRue sued to set aside the transfer of the home, but lost because the trial court concluded that she was unable to show fraud or mistake in the transfer.

I.

The concept of equitable distribution of marital property has achieved an almost universal acceptance in the divorce laws of the various states. It originated when courts applied their equitable powers to secure equitable rights for one spouse in property titled or held by the other spouse based on the claim that a resulting or constructive trust should be impressed on the property. The basis for such a claim was that the spouse seeking an interest in the property had made a substantial economic contribution toward the acquisition of the property. Consequently, under the principles of unjust enrichment, it would be unfair to permit the spouse with title or possession to keep the entire interest. This general rule is set out in 27B C.J.S. *Divorce* § 293:

"Where a wife has made a material contribution to the husband's acquisition

of property during coverture, she acquires a special equity in the property so accumulated which equity entitles her, on divorce, to an award in satisfaction thereof; and it is not a necessary prerequisite that the wife show that she has contributed by funds or efforts to the acquiring of the specific property awarded to her, but division may be had even though the wife has not contributed funds or efforts to the acquisition of the specific property awarded to her." (Footnotes omitted)

Judicial decisions involving these equitable principles have more recently been supplemented and enhanced by various forms of legislative enactments.[1] In the eight states having community property statutes, all property acquired after the marriage is deemed to be owned jointly and upon its dissolution or annulment the parties are generally entitled to share equally in it.[2]

A more common statute, which a majority of states have enacted, permits the court upon the dissolution of a marriage to make an equitable distribution of the marital property based upon a detailed list of factors.[3] A third category of statutes,

---

1. For a survey of the various states' provisions, *see* D. Freed and H. Foster, *Divorce in the Fifty States: An Overview as of August 1, 1981,* 7 Family Law Reporter 4049, 4056–57 (1981). They list thirty-nine states plus the District of Columbia as having some form of equitable distribution statute. Additional articles and comments relating to the right of equitable distribution are contained in the following journals: Foster, *Commentary on Equitable Distribution,* 26 N.Y.L.Sch.L.Rev. 1 (1981); Greene, *Comparison of the Property Aspects of the Community Property and Common-Law Marital Property Systems and Their Relative Compatibility with the Current View of the Marriage Relationship and the Rights of Women,* 13 Creighton L.Rev. 71 (1979); Note, *Equitable Distribution vs. Fixed Rules: Marital Property Reform and the Uniform Marital Property Act,* 23 B.C.L.Rev. 761 (1982). For a disapproving view of equitable distribution, *see* Mulligan & O'Connor, *The Inequity of Equitable Distribution: An Editorial,* 5 Seton Hall Legis.J. 21 (1980).

2. 41 C.J.S. *Husband and Wife* § 462; W. Reppy & C. Samuel, *Community Property in the United States* 1–9 (1982). It appears that in some community property states, the division need not always be equal but equitable factors may be considered. *E.g.,* Comment, *Division of Marital Property on Divorce: What Does the Court Deem "Just and Right",* 19 Hous.L.Rev. 503 (1982), as to Texas' community property statute.

3. Section 767.255 of the Wisconsin statute is rather typical of this category:

"Upon every judgment of annulment, divorce or legal separation, or in rendering a judgment in an action under s. 767.02(1)(h), the court shall divide the property of the parties and divest and transfer the title of any such property accordingly. A certified copy of the portion of the judgment which affects title to real estate shall be recorded in the office of the register of deeds of the county in which the lands so affected are situated. The court may protect and promote the best interests of the children by setting aside a portion of the property of the parties in a separate fund or trust for the support, maintenance, education and general welfare of any minor children of the parties. Any property shown to have been acquired by either party prior to or during the course of the marriage as a gift, bequest, devise or inheritance or to have been paid for by either party with funds so acquired shall remain the property of such party and may not be subjected to a property division under this section except upon a finding that refusal to divide such property will create a hardship on the other party or on the children of the marriage, and in that event the court may divest the party of such property in a fair and equitable manner. The court shall presume that all other property is to be divided equally between the parties, but may alter this distribution without regard to marital misconduct after considering:

"(1) The length of the marriage.

"(2) The property brought to the marriage by each party.

"(2r) Whether one of the parties has substantial assets not subject to division by the court.

"(3) The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.

"(4) The age and physical and emotional health of the parties.

"(5) The contribution by one party to the education, training or increased earning power of the other.

"(6) The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.

"(7) The desirability of awarding the family home or the right to live therein for a reasonable period to the party having custody of any children.

used in a few states is more general and provides that an equitable distribution of property may be made by the court without specifying any guidelines.[4] Finally, in those few jurisdictions that have no specific statute on equitable distribution, the courts have continued to evolve their concepts of equitable distribution with a broad interpretation of traditional equity principles. We, along with Florida, Mississippi, and South Carolina, are in this category.

South Carolina has judicially created a special equity doctrine. Based on earlier cases, the doctrine is defined in *Burgess v. Burgess*, 277 S.C. 283, 286 S.E.2d 142, 143 (1982), as:

"A wife is entitled to a special equity in the husband's property acquired during coverture where the wife has made a material contribution to the acquisition of the property. *Simmons v. Simmons*, 275 S.C. 41, 267 S.E.2d 427 (1980); *Wilson v. Wilson*, 270 S.C. 216, 241 S.E.2d 566 (1978)."

*Burgess* involved a wife who had worked during a portion of her marriage and had contributed her earnings to the support of the family. In *Parrott v. Parrott*, 292 S.E.2d 182 (S.C.1982), a homemaker wife was involved and the court enlarged its definition of special equity by stating:

"Also, where a spouse has made 'material contributions' of industry and labor during marriage to acquisition of property, a special equity or equitable interest

favoring that party can be found." *Id.* at 183.

The court further held:

"The showing made in the instant case persuades us that a third exception to the rule of title should be recognized in South Carolina: where, as here, one spouse has foregone career opportunities at the behest of the primary wage-earning spouse, and throughout a long marriage has remained in the home to rear children and provide a suitable environment for the family, the homemaker spouse shall have upon divorce an equitable interest in real property acquired by the wage-earner spouse during the marriage." *Id.* at 184.

Thus, taken together, *Burgess, supra,* and *Parrott, supra,* reflect that through its special equity doctrine, South Carolina's Supreme Court extends to a spouse the right to recover economic contributions and also homemaking contributions.[5]

The South Carolina Court's evolution of its special equity doctrine can be traced to Florida [6] where the Florida Court held that a wife's economic contributions could give rise to a special equity in her husband's property upon divorce. *E.g., Heath v. Heath*, 103 Fla. 1071, 138 So. 796 (1932); *Carlton v. Carlton*, 78 Fla. 252, 83 So. 87 (1919). Originally, Florida took the position that a special equity did not arise for homemaker contributions. *Eakin v. Ea-*

"(8) The amount and duration of an order under s. 767.26 granting maintenance payments to either party, any order for periodic family support payments under s. 767.261 and whether the property division is in lieu of such payments.
"(9) Other economic circumstances of each party, including pension benefits, vested or unvested, and future interests.
"(10) The tax consequences to each party.
"(11) Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.
"(12) Such other factors as the court may in each individual case determine to be relevant."

4. Section 552.19 of the Michigan statute is representative of this category:

"Upon the annulment of a marriage, a divorce from the bonds of matrimony or a judgment of separate maintenance, the court may make a further judgment for restoring to either party the whole, or such parts as it shall deem just and reasonable, of the real and personal estate that shall have come to either party by reason of the marriage, or for awarding to either party the value thereof, to be paid by either party in money."

5. For a more detailed account of South Carolina's law in this area, *see* Chastain, Henry & Woodside, *Determination of Property Rights Upon Divorce in South Carolina: An Exploration and Recommendation,* 33 S.C.L.Rev. 227 (1981).

6. *See* note 5, *id.* at 235–40.

*kin,* 99 So.2d 854 (Fla.1958); *Heath v. Heath, supra.* This result has now been changed in *Canakaris v. Canakaris,* 382 So.2d 1197 (Fla.1980), where the court authorized lump-sum alimony, based on the wife's contribution to the marriage as a homemaker, in addition to periodic alimony payments.[7]

Mississippi has also recognized, through the device of a lump-sum alimony award in addition to periodic alimony payments, that a wife may receive an amount of money from her husband's assets to compensate her not only for economic contributions made but also for homemaker services. *E.g., Reeves v. Reeves,* 410 So.2d 1300 (Miss.1982); *Clark v. Clark,* 293 So.2d 447 (Miss.1974).[8] In *Jenkins v. Jenkins,* 278 So.2d 446 (Miss.1973), the court made this statement as to a lump-sum alimony award:

> "It appears to us that a lump-sum award in conjunction with an award of monthly alimony would have been proper in this case. As heretofore stated, this couple was married for approximately twenty-four years. At the beginning of the marriage they had no assets and the husband made a salary of $85 per week. At the time of the divorce the appellee admitted assets of $800,000. The appellant's worth was meager by comparison. It seems to us in a case such as this where the wife has contributed to the accumulation of the property of her husband, doing her part as a housewife, it would not be improper that she be allowed a rea-

sonable amount as lump-sum alimony on retrial." 278 So.2d at 449.

Thus, it would appear that in virtually every state either by way of express statute or through court interpretation, some mechanism exists to permit a court in granting a final divorce to provide the wife with some distribution for her homemaker and economic contributions.

█ Our law in this area has not been static.[9] For example in *Dyer v. Tsapis,* 162 W.Va. 289, 249 S.E.2d 509 (1978), we recognized the changing view of divorce as manifested by the legislative adoption of no-fault grounds for divorce:

> "Now, increasingly, divorces are awarded on no-fault grounds and awards of alimony, like contract damages, increasingly emphasize restitution to the exclusion of punishment. The law which once saw marriage as a sacrament now conceptualizes it as roughly analogous to a business partnership." 162 W.Va. at 291–292, 249 S.E.2d at 511. (Footnotes omitted)

In *Patterson v. Patterson,* 167 W.Va. 1, 277 S.E.2d 709 (1981), we fashioned a constructive trust theory, which is essentially a special equity doctrine. Our holding secured the wife's interest in property toward which she had made a material economic contribution. In Syllabus Point 1, we stated:

> "Under Rule 18, *W.Va.R.C.P.* an action to impress a constructive trust upon property acquired through joint funds or joint efforts during coverture but titled

---

**7.** A more detailed discussion of Florida's law is found in Guthrie, *Family Law: The Aftermath of Canakaris,* 35 U.Miami L.Rev. 531 (1981).

**8.** Both *Reeves* and *Clark* dealt with lump-sum awards for economic contributions, with the court in *Reeves* stating:

> "In *Clark v. Clark,* 293 So.2d 447 (Miss. 1974), we held that where the wife has, without salary or remuneration, worked in her husband's business and contributed to the accumulation of assets, she is entitled to some share therein. This is such a case. Indeed, in this case Mrs. Reeves contributed her personal funds towards her husband's entrepreneurial ventures." 410 So.2d at 1302.

Section 93–5–23 of the Mississippi Code is general, as is ours, in regard to an alimony award. In material part, it provides:

> "When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the care, custody and maintenance of the children of the marriage, and also touching the maintenance and alimony of the wife or the husband, or any allowance to be made to her or him."

**9.** For a discussion of West Virginia law in this area, *see* Note, *The Distribution of Marital Real Property Upon Divorce In West Virginia: The Need for Legislative Reform,* 82 W.Va.L.Rev. 611 (1980).

in the name of one spouse only may be joined as an independent count in a divorce complaint, and where all of the requirements for a court of equity to declare a constructive trust exist, the court may impress a trust upon real property as part of its overall relief in a divorce proceeding."

*Patterson* traced the historical antecedents of this rule through our earlier cases, most notably *Philips v. Philips*, 106 W.Va. 105, 144 S.E. 875 (1928), where we said in Syllabus Point 1:

"Where decree of annulment or dissolution of marriage is awarded, or divorce is granted either from bed and board or from the bonds of matrimony, the court has power under section 11, Chapter 64, Code [1923], to decree further concerning the estate of either or both of the parties acquired during marriage, as the court may deem expedient, including an equitable division thereof."

Although this Court in *Selvy v. Selvy*, 115 W.Va. 338, 177 S.E. 437 (1934), viewed the 1931 revision of W.Va.Code, 48–2–15, to be more restrictive than the predecessor statute discussed in *Philips, supra,* it did so without taking into account that, in the 1931 Code revision, a new section, W.Va. Code, 48–2–19, was added to compensate for the changes made in W.Va.Code, 48–2–15 (1931).[10] Even the single Syllabus of *Selvy v. Selvy, supra,* recognized that a divorce court still had its traditional equitable powers over the estate of the parties if such powers were invoked by proper pleadings:

"In a suit for divorce under 48–2–15, Code, a circuit court has no jurisdiction to deal with the estates of the parties, save as it may be necessary to do so in order to make effectual its decree concerning the maintenance of the parties, or either of them, or the care and custody, education, and maintenance of minor children. *In order to sustain a decree that plainly exceeds that purpose in dealing with the estates of the parties, the allegations of the bill of complaint must be such as to justify the court in dealing with such estates on some ground invoking the general equity powers of the court, in addition to those allegations justifying its jurisdiction for divorce.*" (Emphasis added)

Moreover, as *Patterson* also pointed out, our sanctioning of equitable concepts in divorce actions had extended to the award of the physical possession of a jointly-owned home as an incident to the award of custody of minor children. *Murredu v. Murredu,* 160 W.Va. 610, 236 S.E.2d 452 (1977). In *Marshall v. Marshall,* 166 W.Va. 304, 273 S.E.2d 360 (1981), we recognized that a fiduciary relationship existed between husband and wife in regard to their property transactions with each other and inequitable conduct on the part of one in obtaining property from the other would

---

10. The relevant portion of the 1923 Code, Chapter 64, Section 11, relied on in *Philips v. Philips, supra,* was:

"Upon decreeing the dissolution of a marriage, and also upon decreeing a divorce, whether from the bond of matrimony or from bed and board, the court may make such further decree as it shall deem expedient, concerning the [estate and] maintenance of the parties, or either of them; and the care, custody and maintenance of the minor children, and may determine with which of the parents the children, or any of them may remain." (Brackets added)

In the 1931 Code, this section became W.Va. Code, 48–2–15 (1931), but the bracketed words "estate and" were dropped. However, there was added in 1931 a new provision, W.Va.Code, 48–2–19, which stated:

"Upon decreeing the annulment of a marriage, or upon decreeing a divorce, whether from the bond of matrimony or from bed and board, the court shall have power to award to either of the parties whatever of his or her property, real or personal, may be in the possession, or under the control, or in the name, of the other, and to compel a transfer or conveyance thereof as in other cases of chancery."

The reviser's notes to W.Va.Code, 48–2–19, clearly indicate the purpose of this new statute: "As there is omitted from § 15 the provision giving the court power to decree 'concerning the estate of the parties, or either of them' ... it is deemed advisable to add this section here." The paradox is that as a result of the Court's failure in *Selvy* to look to these reviser's notes an unwarranted restriction was brought into our divorce law. *See Wood v. Wood,* 126 W.Va. 189, 28 S.E.2d 423 (1943). This same language is now found in W.Va.Code, 48–2–21.

result in an order to reconvey such property. In *Pierce v. Pierce*, 166 W.Va. 389, 274 S.E.2d 514, 516 (1981), we remanded the case to permit the wife "to petition under W.Va.Code, 48–2–21 for the purpose of establishing an equitable ownership interest in the mobile home."

## II.

*Patterson, supra,* spoke in terms of a constructive trust, and this theory encompasses transfers that are induced by fraud, duress, undue influence, and mistake, which are not necessary elements for the right to equitable distribution on divorce.[11] Moreover, a constructive trust theory can be brought at any time, whereas the right to equitable distribution arises only as an incident to a final divorce.[12] Equitable distribution rests upon concepts of unjust enrichment which was the focal point in *Patterson:*

"It is apparent from the law of trusts that the purpose of a constructive trust is to redress unjust enrichment resulting from an equitable wrong. The extent of the property subjected to the trust should be equal to the extent of unjust enrichment. That is, a wife should be entitled to a trust in property to the extent that the husband is unjustly enriched by her contribution." 167 W.Va. at 12–13, 277 S.E.2d at 716.[13]

■ Thus, we believe that *Patterson's* principles are compatible with the doctrine of equitable distribution, which permits a spouse, who has made a material economic contribution toward the acquisition of property which is titled in the name of or under the control of the other spouse, to claim an equitable interest in such property in a proceeding seeking a divorce. Furthermore, because these are economic contributions, the right to claim such equitable relief is not barred because the party seeking them may be found at fault in the divorce action. We view these tangible economic contributions to be sufficiently akin to a property interest to justify the court's returning the contribution to the claiming party regardless of fault.

■ In determining an appropriate amount for equitable distribution where there have been economic contributions made (other than homemaker services), it is necessary to consider the respective economic contributions made by both parties during the marriage as weighed against the net assets that are available at the time of the divorce. The term "net assets" does not include assets acquired by a party prior to the marriage, or obtained during the marriage by way of inheritance or gifts from third parties. In computing the value of any net asset, the indebtedness owed against such asset should ordinarily be deducted from its fair market value.

■ In an appropriate case, the court in calculating the amount of equitable distribution arising from economic contributions may take into account the value of gifts

---

11. *Patterson, supra* 167 W.Va. at 10, 277 S.E.2d at 715, quoted 5 *Scott on Trusts,* § 404.2:

"'A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence or mistake, or through a breach of fiduciary duty, or through the wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it.'"

12. A constructive trust also involves the tracing of funds to some tangible property on which the trust can be impressed. *Williams v. McCarty,* 82 W.Va. 158, 95 S.E. 638 (1918). However, we have not adhered to a rigid tracing requirement. In *Annon v. Lucas,* 155 W.Va. 368, 185 S.E.2d 343 (1971), we permitted the plaintiff to recover funds obtained from the sale of a farm promised to the plaintiff. The sale had occurred some fifteen years prior to the institution of the suit. The ability to trace funds is not a requirement for a claim of equitable distribution in a divorce action.

13. *Patterson, supra* 167 W.Va. at 12, 277 S.E.2d at 716, began its discussion of this issue by stating:

"While we have ample authority on unjust enrichment, fraud, duress, undue influence, mistake, or breach of implicit fiduciary duty such as will support the impressing of a constructive trust, the question of what types of services will support a constructive trust between husband and wife appears to be novel."

made to the spouse seeking equitable contribution by the other spouse.[14]

Finally, we recognize that economic contributions are similar to property interests. A court may, in an appropriate case, transfer title to both real and personal property to satisfy an award for economic equitable distribution. We believe that such an interest falls within the purview of W.Va.Code, 48–2–21 (1969), which authorizes the transfer of property "in the possession, or under the control, or in the name, of the other . . . as in other cases of chancery."[15] Where a spouse has retained possession or control of the other spouse's economic contribution, it is only equitable that it be transferred back upon the dissolution of the marriage.

### III.

A related area involving equitable distribution is that of homemaker services. Although this point was not at issue in *Patterson, supra,* the matter was addressed in part of Syllabus Point 3:

"Traditional domestic services such as those as wife, mother, and housekeeper and incidental contributions to a husband's business never alone give rise to

grounds for impressing the property of the husband with a trust."

It is possible to distinguish this language by pointing out that it is cast in terms of a constructive trust which is not coextensive with the doctrine of equitable distribution. However, candor compels us to conclude that any attempt to distinguish this language would be at best semantical and not substantive. A more forthright course would be to acknowledge that this language in *Patterson, supra,* was too broad and absolute. To the extent that it absolutely forbids consideration of homemaker services in the equitable distribution of marital assets upon a divorce, it is overruled.[16]

Homemaker services, however, present a more complex problem than economic contributions. In the traditional view of marriage, the husband's obligation was to support his wife and she in turn rendered domestic or homemaker services.[17] The theory of alimony is based upon the husband's legal obligation to support his wife, and thus upon the dissolution of a marriage where she was not at fault, the wife is entitled to alimony. In *State ex rel. Cecil*

14. By permitting some consideration to be given to the value of gifts, we do not mean to suggest any change in our rule relating to the presumption of gift between husband and wife. W.Va. Code, 48–3–10 (1931). *See Davis v. Davis,* 137 W.Va. 213, 70 S.E.2d 889 (1952); *Wood v. Wood,* 126 W.Va. 189, 28 S.E.2d 423 (1943); *Boyd v. Boyd,* 109 W.Va. 766, 155 S.E. 303 (1930). In an appropriate case, the court is permitted to take the value of such gift into account in determining the wife's equitable distribution claim. A typical example would be where the husband has purchased the home property out of his own assets and placed the legal title in both his name and that of his wife. Upon the divorce, it would be permissible for the court, after determining the amount of equitable distribution due the wife, to consider as an offset the initial value of the one-half interest in the home property given to the wife. Such an offset would not affect the legal title.

15. We do not envision that the right to equitable distribution based on economic contribution would entail any drastic shifting of legal title to real property. Ordinarily, satisfaction may be had by requiring the payment through sale or transfer of personal assets. In note 3 of *Murredu v. Murredu,* 160 W.Va. at 616–617, 236 S.E.2d

at 457, we said: "We read W.Va.Code, 48–2–21, as not being applicable to jointly owned property." The note was and is confined to the limited situation where a spouse was authorized to have physical possession of the home property as an incident to receiving custody of the minor children. Nothing in this statute or in today's opinion precludes a circuit court from making an order directing transfer of either real or personal property jointly owned to satisfy an equitable distribution award based on economic contribution. This was recognized in *Patterson v. Patterson, supra. See also* note 2, *Simmons v. Simmons,* 171 W.Va. 170, 298 S.E.2d 144, 147 (1982).

16. Somewhat similar language is found in *Wilcoxon v. Carrier,* 132 W.Va. 637, 649, 53 S.E.2d 620, 626 (1949), and it is also disapproved.

17. In *Oates v. Oates,* 127 W.Va. 469, 475, 33 S.E.2d 457, 460 (1945), we said:

"In the absence of statutory authority, an agreement between husband and wife by which the wife agrees to perform the domestic duties imposed by the marital relation for a consideration is contrary to public policy and void." (Citations omitted)

*v. Knapp,* 143 W.Va. 896, 904, 105 S.E.2d 569, 574 (1958), we said:

"Though the power of courts of equity to award alimony is derived from statute it did not originate in any statute but stems from the legal obligation of the husband, incident to the marriage state, to maintain his wife in a manner suited to his means and social position.... Alimony is a right of the wife which she may forfeit by her misconduct; and when she is the offender she can not have an award of alimony in a decree of divorce in favor of her husband, in the absence of a statute which authorizes such award." (Citations omitted)

*See also In Re: Estate of Nicholas,* 144 W.Va. 116, 107 S.E.2d 53 (1959); *Snyder v. Lane,* 135 W.Va. 887, 65 S.E.2d 483 (1951); W.Va.Code, 48–2–28; W.Va.Code, 48–3–24. Thus, to some extent, it may be argued that homemaker services were the consideration for the husband's traditional obligation to support his wife. There is, however, an increasing recognition that homemaker services cannot be viewed as a mere adjunct to the husband's duty of support.

We have previously cited South Carolina's use of the doctrine of equitable distribution in *Parrott v. Parrott, supra,* where the homemaker wife was given "an equitable interest in real property acquired by the wage-earner spouse during the marriage." 292 S.E.2d at 184. This rule is analogous to the statement made in note 1 of *Patterson, supra,* where we said:

"To the extent that *Murredu* limits the authority to grant exclusive possession of the home property to one spouse incident to obtaining custody as suggested in *State ex rel. Collins v. Muntzing,* 151 W.Va. 843, 157 S.E.2d 16 (1967) and *State ex rel. Hammond v. Worrell,* 144 W.Va. 83, 106 S.E.2d 521 (1958), we expressly state that a spouse may receive a life estate subject to remarriage in the home property regardless of any custody of children. As we stated in *Dyer v. Tsapis,* 162 W.Va. 289, 249 S.E.2d 509, (1978) the spouse who is no longer young, who has no occupational skills, and who has devoted time to his or her role as a homemaker has a greater claim to an award of alimony. Therefore, we wish to ensure that a trial court be empowered to award a life estate to a deserving spouse, subject to remarriage."

■ Several other considerations are relevant to an award based on homemaker services. First, it is not limited to the giving of a possessory interest in real estate. A court may determine that a lump-sum monetary amount should be awarded. Second, the concept of homemaker services is not to be measured by some mechanical formula, but instead rests on a showing that the homemaker has contributed to the economic well-being of the family unit through the performance of the myriad of household and child-rearing tasks which make up the term "homemaker services."

In valuing this service, the length of the marriage is an important factor and consideration should be given to the quality of the services. For example, a homemaker who, over the course of the marriage, has been frugal in the handling of homemaker expenditures and has thereby enhanced the family assets is entitled to a more equitable return than one who has been extravagant. Some consideration should also be given to the age, health, and skills of the homemaker as well as the amount of independent assets possessed.

■ Finally, we believe that fault is a factor to consider when valuing homemaker services even though it is not a factor where economic contributions have been made. The reason for considering fault is that, historically, homemaker services were the wife's marital contribution upon which rested the husband's countervailing support obligation and his duty to pay alimony if the marriage was dissolved without fault on the wife's part.

We do not suggest that fault on the wife's part is an absolute bar to her receiving some equitable distribution for homemaker services. Where the divorce is granted on a no-fault ground, such as voluntary separation or irreconcilable differences, W.Va.Code, 48–2–4(a)(7) and (10), we have held that fault and inequitable conduct are not a bar to an award of alimony. *F.C. v. I.V.C.,* 171 W.Va. 458, 300 S.E.2d 99

(1982); *Haynes v. Haynes,* 164 W.Va. 426, 264 S.E.2d 474 (1980). Such holdings are obviously applicable to an equitable distribution for homemaker services. Moreover, we do not foreclose the trial court from giving some equitable distribution for homemaker services even where traditional fault grounds exist, where an otherwise compelling case for equitable distribution for homemaker services can be shown.

█ Just as in the economic contribution area, a court may consider the value of any gifts given to the homemaker spouse during the marriage by the other spouse. The value of homemaker services must also be considered in relation to the net assets available at the time of the divorce and in light of the alimony award. Finally, we do not consider an award for equitable distribution based on homemaker services to give rise to the right to have transfer made of the legal title to real estate. In this respect, equitable distribution for homemaker services differs from the theory of an equitable distribution award based on economic contributions because in the former we considered the tangible economic contributions to be in the nature of a property interest sufficient to come within W.Va.Code, 48–2–21. When a monetary award for homemaker services is decreed, it has the same characteristics as a judgment. Moreover, since homemaker services have some correlation to the right to alimony, the award is entitled to the lien provisions of W.Va.Code, 48–2–17.[18]

### IV.

█ Several procedural comments are in order. First, a claim for equitable distri-

bution based on either economic contributions or homemaker services must be specifically asserted in the divorce action. In the absence of such a claim, the court need not proceed to consider the issue. We have traditionally required a particular assertion of property claims in a divorce action. *Patterson v. Patterson, supra; Murredu v. Murredu, supra; Wood v. Wood, supra.*

█ Second, claims for equitable distribution may be settled and foreclosed by property settlement agreements fairly negotiated[19] by the parties as in the case of other property settlement agreements. *See In re Estate of Hereford,* 162 W.Va. 477, 250 S.E.2d 45 (1978). Courts in other jurisdictions that recognize a right of equitable distribution have rather uniformly adopted this rule. *See In re Marriage of Olsher,* 78 Ill.App.3d 627, 34 Ill.Dec. 32, 397 N.E.2d 488 (1979); *Carlsen v. Carlsen,* 72 N.J. 363, 371 A.2d 8 (1977); *Peterson v. Peterson,* 313 N.W.2d 743 (N.D.1981); *In re McDonnal and McDonnal,* 293 Or. 772, 652 P.2d 1247 (1982); *Laird v. Laird,* 597 P.2d 463 (Wyo.1979).

█ Third, the rights of equitable distribution do not alter our existing law with regard to alimony and child support.

Finally, we address the applicability of the doctrine of equitable distribution to pending cases. In *Bradley v. Appalachian Power Company,* 163 W.Va. 332, 256 S.E.2d 879 (1979), we discussed at some length the concept of retroactivity in a civil case[20] and concluded in Syllabus Point 5:

---

18. W.Va.Code, 48–2–17, provides:
    "An order for support, maintenance or alimony shall not give rise to a lien on any real estate of the person against whom the order is entered until such order is entered of record in the office of the clerk of the county court where any such real estate is situate. On and after the effective date of this section [April 1, 1969], any such order shall be recorded in the same manner as other judgments are recorded."

19. The concept that a property settlement agreement incident to a divorce must be fair and equitable has long been recognized in our law. *E.g., Smith v. Smith,* 125 W.Va. 489, 24 S.E.2d

902 (1943); *Hartigan v. Hartigan,* 58 W.Va. 610, 52 S.E. 720 (1906).

20. The issue of retroactivity is a confused area of the law. Frequently, the issue is not raised by the parties and therefore not addressed. *Compare Coffindaffer v. Coffindaffer,* 161 W.Va. 557, 244 S.E.2d 338 (1978), *with Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982). Moreover, not every decision setting a new principle of law triggers a question of retroactivity as the issue is generally limited to those cases that make a clear departure from existing law. *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Commentators are unable to formulate either a suit-

"In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decision."

*See also Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982); *Bond v. City of Huntington,* 166 W.Va. 581, 276 S.E.2d 539 (1981); *Ables v. Mooney,* 164 W.Va. 19, 264 S.E.2d 424 (1979).

■ Because equitable distribution based on economic contributions does not involve any substantial departure from our prior law which is contained in *Patterson* and related cases, it is available in pending cases where the issue is specifically asserted. However, the right to an equitable

distribution based on homemaker services is a new rule.

In *Bradley,* we dealt with the establishment of comparative negligence and overruled the common law concept of contributory negligence, and gave full retroactivity to the doctrine of comparative negligence. We recognized that tort laws are subject to continual judicial and legislative changes. Furthermore, because of the rather short statute of limitation period for filing tort actions, the beneficiaries of the new decision were a rather limited class.

Divorce law, however, is a rather settled area of law, and there was no clear foreshadowing that the right to homemaker services could be recovered other than a general broadening of equitable principles in divorce actions. *Pierce v. Pierce, supra, Marshall v. Marshall, supra; McKinney v. Kingdon,* 162 W.Va. 319, 251 S.E.2d 216 (1978); *Dyer v. Tsapis, supra; Murredu v. Murredu, supra.* In fact, in *Patterson v. Patterson, supra,* we indicated that the value of such services could not be obtained by way of the imposition of a constructive trust. Furthermore, this change is substantive, not procedural, and the class of beneficiaries is more extensive than in a tort case. There is no definite statute of limitations for filing for divorce because divorce actions are equitable and are governed by the doctrine of laches. *Kittle v. Kittle,* 86 W.Va. 46, 102 S.E. 799 (1920).[21]

Under *Bradley,* we may also consider the treatment of retroactivity in decisions from other jurisdictions. Although this question has not been considered by Florida, Mississippi, or South Carolina, the issue has been raised in other jurisdictions following the enactment of statutes giving equitable distribution rights. In such cases, the claim is usually made that the statute should not

---

able test for when a retroactivity problem arises or what factors should be considered in resolving the issue. Beytagh, *Ten Years of Non-Retroactivity: A Critique and a Proposal,* 61 Va.L. Rev. 1557 (1975); Currier, *Time and Change in Judge-Made Law: Prospective Overruling,* 51 Va. L.Rev. 201 (1965); Traynor, *Quo Vadis, Prospective Overruling: A Question of Judicial Responsibility,* 28 Hastings L.J. 533 (1977); *see generally* Annot., 10 A.L.R.3d 1371 (1966). At the heart of any retroactivity issue is the attempt to draw

some just balance line between two competing issues: the reliance by the parties on the prior law with its settled expectations, as against the need to bring new principles to bear on the changing conditions of society in pending cases.

21. *Kittle, supra,* recognized, as do we, the three-year statute of limitations for adultery. W.Va. Code, 48–2–14.

apply to a divorce where the marriage occurred prior to the effective date of the statute, because that application would impair existing contracts and violate due process. These claims have been uniformly denied. *E.g., In re Marriage of Bouquet,* 16 Cal.3d 583, 546 P.2d 1371, 128 Cal.Rptr. 427 (1976); *Kujawinski v. Kujawinski,* 71 Ill.2d 563, 17 Ill.Dec. 801, 376 N.E.2d 1382 (1978); *Corder v. Corder,* 546 S.W.2d 798 (Mo.App.1977); *Rothman v. Rothman,* 65 N.J. 219, 320 A.2d 496 (1974); *Valladares v. Valladares,* 55 N.Y.2d 388, 449 N.Y.S.2d 687, 434 N.E.2d 1054 (1982); *Pollack v. Pollack,* 56 N.Y.2d 968, 453 N.Y.S.2d 623, 439 N.E.2d 339 (1982).

Admittedly, the issues in these cases are not identical to the issue here, which is whether the doctrine of equitable distribution for homemaker services is applicable to pending cases. In *Valladares, supra,* the court addressed the question of whether a suit instituted prior to the date of the new act could be amended or refiled in order to obtain the benefits of the new act. The court concluded that ordinarily relief under the new act was available only for those suits filed subsequent to the new act.

■ Under the foregoing analysis, we believe that today's holding permitting equitable distribution based on homemaker services should be applied prospectively, that is, only to those cases filed after the date of this opinion. Since we have applied the homemaker principles to the present case, we will extend these principles to those cases presently on appeal to this Court where an equitable distribution claim for homemaker services has actually been presented in the lower court.

## V.

■ Applying these principles of equitable distribution to the facts of the present case, we must reverse this case and remand it for further consideration. The record demonstrates that Mrs. LaRue was given the divorce on the no-fault ground of irreconcilable differences. The trial court found that Mr. LaRue was guilty of abusive conduct and essentially exonerated Mrs. LaRue from any fault.

Under these circumstances, Mrs. LaRue was entitled to some equitable distribution on both theories. First, during the early years of her marriage, she had contributed her earnings, totalling $51,000. This economic contribution must be considered, but its value will have to be determined based on a comparison of the contributions made by Mr. LaRue as weighed against the net assets at the time of the divorce. Second, Mrs. LaRue's homemaker services, which were contributed over a considerable period of time, also entitle her to some equitable consideration. Again, her contributions must be calculated against the net marital assets.

Although Mrs. LaRue sought unsuccessfully in a separate suit to obtain legal title to an undivided one-half interest in the home property, *res judicata* does not foreclose this asset from being valued as a part of the net assets. The same is true of the joint bank accounts whose funds were withdrawn by Mr. LaRue shortly before the divorce action was filed. In *St. Clair v. St. Clair,* 166 W.Va. 173, 273 S.E.2d 352, 355 (1980), we noted with approval the trial court's action in restoring to the wife one-half of the money in a jointly-owned bank account, all of which had been removed by the husband shortly before the divorce. A more complete discussion is found in *Simmons v. Simmons,* 171 W.Va.170, 298 S.E.2d 144 (1982), where we referred to W.Va.Code, 31A–4–33, relating to the creation of a joint bank account, and the case of *Dorsey v. Short,* 157 W.Va. 866, 205 S.E.2d 687 (1974), which permitted a rebuttable presumption of a gift. In *Simmons v. Simmons, supra,* we concluded that there were not sufficient facts in the record to conclude that the presumption of gift had been rebutted. Earlier in this opinion, we pointed out that where a court determines that an award of equitable distribution is appropriate, it could consider the value of gifts made to the spouse seeking contribution by the other spouse. We also explained in note 14 that the rule was not to be construed to mean that we are weakening the presumption of a gift.

The purpose of permitting a trial court to give some consideration to the value of interspousal gifts on equitable distribution is to provide for the situation where a spouse retains his or her interest in jointly-held property because the presumption of gift has not been rebutted and such retaining spouse is also entitled to some equitable distribution. In the present case, if Mr. LaRue is not able to rebut the presumption of gift arising from the creation of the joint bank accounts, then Mrs. LaRue would be entitled to one-half of their value. However, if this money constituted a gift,[22] its value could be offset, in the court's discretion, on the amount of the ultimate equitable distribution that she is awarded. Of course, if the presumption of gift is rebutted by Mr. LaRue, his retention of the bank accounts will provide no offset against the amount of equitable distribution found to be due.

Under the foregoing principles, we reverse the judgment of the Circuit Court of Ohio County and remand the case for further consideration.

Reversed and Remanded.

NEELY, Justice, concurring:

I gladly concur in the result reached by the majority. I feel compelled to write a concurring opinion in this case, however, for a number of reasons. First, the economic considerations that inform my adoption of this result deserve to be made explicit. Second, the collateral problems presented by assets best characterized as "future interests", such as insurance coverage, pension rights, and interests in developing properties, merit further discussion. Third, from both a legal and practical point of view, I have grave reservations about the adoption of a fault standard to govern the value of homemaking services. Fourth, I believe that today's alteration of our divorce law has repercussions that should affect the rules under which alimony is currently awarded. Fifth, I do not

believe that the presumption of gift should operate among divorcing parties with the same vigor that it operates between a husband or wife and others not party to that marital unit.

At the outset, I should explain that I find statutory authority for today's ruling in the language of *W. Va. Code*, 48–2–21 [1969]. This provision in its entirety provides:

Upon decreeing the annulment of a marriage, or upon decreeing a divorce, the court shall have power to award to either of the parties whatever of his or her property, real or personal, may be in the possession, or under the control, or in the name, of the other, and to compel a transfer or conveyance thereof as in other cases of chancery.

The broad equitable powers conferred on our courts by this statute I believe allow room for a court to find that economic and homemaking contributions to a marriage give rise to a property interest subject to *Code*, 48–2–21 [1969].

A marriage is, as the majority has stated, to some degree an economic partnership. Both partners contribute services that have a recognizable value to the household. In most marriages a surplus is generated by the parties' forbearance from immediate consumption of the marital income. This marital surplus is commonly invested in a dwelling, and in insurance and other investments to assure the protection of the partners from penury should sudden and unforeseen events, or the quiet onslaught of age, diminish the family earnings. It does no violence to this statute, I believe, to recognize that contributions of a party to his or her marriage give rise to a property right to a proportionate share of that marital surplus.

Admittedly, we have always assumed an extremely narrow authority under *Code*, 48–2–21 since the first statute on this subject was enacted in 1931. Nonetheless, the

---

22. Because the facts surrounding the creation of the joint bank accounts are not in the record, we have assumed that the money came from Mr. LaRue's earnings and therefore the presumption of gift arises. We do not foreclose

Mrs. LaRue from showing that some portion of the joint bank accounts came from her economic contribution. To the extent that she does, the "gift credit" is not available on equitable distribution.

door has always been open to us to expand the equitable jurisdiction of courts in property awards, and as divorce has become a more prevalent occurrence, and its regulation a more social and less personal question, we have done so.[1] Without qualifying my admiration for the redoubtable authority marshalled by the majority, I conclude that I would urge the step we have taken today regardless of the authority in other jurisdictions.

I further believe that the circuit courts, who shall have to implement this decision, are better served by an opinion that derives from a West Virginia statute and an explicit, coherent theory implementing it then they are by an opinion derived from foreign authority. In the inevitable unmapped areas that today's innovating opinion will leave, our courts should have a statute and a theory to refer back to; from these twin polestars they can plot a course that will approximate our own. In the event that

they encounter (God forbid) stupid authority, they will be able to resist its siren song and hold a true course.

## I

My enthusiasm for today's holding arises largely from my understanding of the economic plight of women in America. Simply put, women are poorer than men.[2] The mean wage for women who work full time is 59 percent of the equivalent mean wage for men. Among single men and women who are not living with relatives, the poverty rate for men is 18.1 percent; the rate for women is 27.7 percent. Once a man and woman are married, if both are working full time, the woman's wage on average amounts to only 34.7 percent of the family earnings. When a marriage has ended, the situation becomes bleaker; 10.3 percent of male single parents fall below the poverty line (a total of 205,000); 34.6 percent of single women with children, or a total of

1. The history of our law governing the financial resolution of a divorce shows our constant and increasing discontent with the failings of alimony and child support. Although we have always exercised the narrowest possible authority under *Code,* 48-2-21, we have also always been alert to grounds for equitable exceptions to our constricted view. Prominent among those grounds has been the unjust enrichment of a spouse upon dissolution of the marriage. As we recently stated in *Patterson v. Patterson,* 167 W.Va. 1, 277 S.E.2d 709 (1981):

> It is apparent from the law of trusts that the purpose of a constructive trust is to redress unjust enrichment resulting from an equitable wrong. The extent of the property subject to the trust should be equal to the extent of unjust enrichment. That is, a wife should be entitled to a trust in property to the extent that the husband is unjustly enriched by her contribution.

167 W.Va. at 12–13, 277 S.E.2d, at 716.

The disabilities of alimony and child support as the exclusive means of effecting a fair distribution of marital assets were recognized long before *Patterson,* however. In *Goff v. Goff,* 60 W.Va. 9, 53 S.E. 769 (1907), we permitted a lien on a husband's land to assure the payment of alimony. Subsequently, in *Reynolds v. Reynolds,* 68 W.Va. 15, 69 S.E. 381 (1910), though we refused to award "the fee simple title of a husband in his lands," id., at 24, 69 S.E. 381, to the wife, we acknowledged that "the better rule ... is to give the wife ... life estate in the realty." *Id.,* at 23, 69 S.E. 381. *Wood v. Wood,* 126 W.Va. 189, 28 S.E.2d 423 (1943) found statutory authority allowing divorce courts "power to

make any order or decree concerning the estate of the parties ... for the purpose of making effectual any order or decree ... relating to the maintenance of the parties or the custody and maintenance of their children. *Id.,* syl. pt. 2.

In *Kinsey v. Kinsey,* 143 W.Va. 574, 103 S.E.2d 409 (1958) and *Murredu v. Murredu,* 160 W.Va. 610, 236 S.E.2d 452 (1977) we approved awards granting use of the family home to the parent with custody of the children. (This authority was enlarged by footnote one of *Patterson, supra,* which opined that a life estate in the home may be awarded regardless of custody of the children). In *McKinney v. Kingdon,* 162 W.Va. 319, 251 S.E.2d 216 (1978) we approved the transfer of the title to the family automobile from the husband to the wife, once again to effectuate an order of custody concerning children. *Patterson,* thus, is the last in a long series of cases in which we have stretched at our self-imposed bounds to avoid inequity in the financial settlement of a divorce.

2. The statistics in this paragraph are taken from "Money Income and Poverty Status of Families and Persons in the United States: 1981", Series P. 60 No. 134, *Consumer Income,* U.S. Department of Commerce, Bureau of the Census (1982) updating "Money Income of Households, Families and Persons in the United States: 1980"; Series P. 60 No. 132, *Consumer Income,* U.S. Department of Commerce, Bureau of the Census (1982) and "Characteristics of the Population Below the Poverty Level: 1980," Series P. 60, No. 133, *Consumer Income,* U.S. Department of Commerce, Bureau of the Census (1982).

3.4 million such women, fall below the poverty line. In fact, divorced women with children now make up a new class of the poverty-stricken.[3] By contrast, the poverty rate for families headed by a married couple is only 6.8 percent.

Among the factors leading to this result, two are prominent. The first is that court-ordered awards, which overwhelmingly go to the former wife, are frequently not paid. The second, that divorced women often do not have access to that part of the marital surplus invested in pensions or insurance, is discussed at length *infra*, in Section II.

Among divorced or currently separated women, 14.3 percent were entitled to alimony or maintenance as of the spring of 1979. The alimony or maintenance award amounted to over 25 percent of the mean income of those women who actually received it. However, of those women entitled to receive alimony or maintenance payments in 1978, 28.4 percent did not receive the full amount due them, and 30.5 percent received nothing at all. The equivalent statistics for child support payments are only a slight improvement: 22.7 percent of the women entitled to child support received less than the full amount due them, and 28.4 percent received no child support payments at all.[4]

Our growing experience with the financial position of divorced women leads me to the conclusion, confirmed by this statistical data, that West Virginia's current scheme for allocating marital property acquired through joint efforts is inadequate to protect women[5] and their dependent children from unfair results. Since the statute does not by its terms foreclose us from developing equitable doctrines—such as those adopted in *Patterson v. Patterson*, 167 W.Va. 1, 277 S.E.2d 709 (1981)—that will provide greater financial security upon divorce, it is incumbent upon us to do so. As a court supervising the exercise of equitable jurisdiction over these matters, we must repudiate rules that confer an unfair advantage on one party at the other's expense.[6] As the statistics illustrating the national epidemic of non-payment (*supra*) indicate, our reliance on alimony and child support as the means of distributing the marital surplus confers just such an unfair advantage.

The effects of this unfair advantage are manifest in the facts of this case. The LaRues had been married for thirty years, and had raised two sons, both now grown. At the time of the divorce, Mrs. LaRue was fifty-one years old. Mrs. LaRue had worked for a little over seven years during the marriage, and contributed total earnings of approximately $51,000 to the marriage over the course of her employment. The LaRues had enjoyed a comfortable lifestyle. Their gross income in the last year of the marriage, during which Mrs. LaRue was not working, was forty-three thousand dollars—a sum sufficient to assure the La-Rues' financial security and allow them a number of luxuries.

3. The Bureau of Census has measured the incidence of poverty in families of different ethnic origins. In every ethnic group the incidence of poverty is more than twice as high among families headed by single women as it is among any other type of family. In the categories "all families" and "white families" the incidence of poverty among families headed by single women is over three times as great as that of any other family category. In fact, the median income of households headed by women ($10,960) is lower than the median income of black ($13,267) or Hispanic ($16,402) households, and is less than half that of white households ($23,517).

4. These statistics are taken from "Child Support and Alimony: 1978," Series P. 23, No. 112, *Special Studies,* U.S. Department of Commerce, Bureau of the Census (1981).

5. Although our divorce law is sex-neutral, and alimony and support payments may be awarded to men as well as women, as a matter of practice alimony and child support are largely women's remedies. A motivating concern in this case is the inferior financial position that women in West Virginia, as well as throughout America, enjoy relative to men. Although it is not our task to remedy affirmatively this position, neither need we countenance rules that aggravate women's economic plight.

6. Our adoption of the "primary caretaker" rule, *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981), which to a degree protects the primary caretaker (usually the mother) from having to bargain away her financial security as the price of avoiding a custody battle over the children, was a first step in this direction.

Upon the divorce, Mrs. LaRue was awarded alimony of two hundred forty dollars per month, along with an allowance for hospitalization and medical insurance. The alimony has since been raised to four hundred and fifty dollars per month. Mrs. LaRue has also received two thousand dollars, which she herself withdrew from a joint account shortly after the separation, a 1977 Mercury Bobcat automobile, a share of the household goods, and stocks valued at approximately fourteen hundred dollars. Mrs. LaRue's job prospects are limited by her age, her lack of recent work experience, and a debilitating arthritic condition from which she suffers.

Mr. LaRue retained the family home, a 1977 Mercury Cougar automobile, the lion's share of the household goods, bank accounts with balances totalling approximately twenty-seven thousand dollars, corporate stock with a value of two thousand one hundred dollars, and his partnership share in his accounting firm. He also retained control of nine life insurance policies, the beneficiary designations of which have apparently been changed since the separation of the parties to remove Mrs. LaRue as a beneficiary.

The financial ruin of Mrs. LaRue was countenanced under our existing law because the LaRue marriage had been a traditional one in the sense that Mr. LaRue, a certified public accountant, exclusively handled the family's financial affairs. Consequently, most family assets were titled in his name, and were therefore under our law considered his property upon divorce. A broader reading of *Code*, 48–2–21 [1969], embracing the concepts of the marital surplus and recognizing economic and home-making contributions, closes this ghastly chasm in our legal landscape.

## II

This Court's holding today opens a wide field of opportunity to the circuit courts, whose options previously were by and large limited to alimony and child support. (Again, see note 1, *supra*). It is my hope that the circuit courts, who are after all primarily responsible for the administration of West Virginia's family law, will creatively avail themselves of the opportunities that equitable distribution presents. Unfortunately, there are many problems which are beyond the capacity of courts to solve. Courts can only distribute wealth, they cannot create any. The economies of scale that prevail in joint households are irretrievably lost when a married couple separates. Pensions adequate to support two retired people living together may not be adequate to support the two retired people living separately. Similarly, when an active head of a household becomes disabled, he may still be able to support a joint household with insurance proceeds, but may no longer be able to meet his alimony or child support obligations.

However, there is a second problem which courts may successfully address, which comes to mind because of some of the peculiar forms the marital surplus is likely to assume. The "savings" of the average American family no longer take the form of cash on hand in a savings account in the local bank. Rather, the "savings" are invested in the family home, plowed back into ongoing business ventures, or used to buy institutional insurance and pension programs. These forms of "savings" are often tied to the family wage-earner personally, or held in the name of the partner who is responsible for taking care of the financial affairs of the family.

The advent of societal institutions selling financial protection in a pension/insurance package has transformed the nature of America's wealth from present capital to future interest. These modern institutions serve the same need that traditional savings arrangements served—to wit, protection from the vagaries of fortune over time—but do so more efficiently because the good and bad fortunes of individuals are for these institutions merely statistical parameters. To the extent that these various forms of savings represent investments rather than assets—and some are investments under very strict terms—they present a new challenge to courts attempting to effect among divorcing parties a fair

financial reconciliation. With a little effort and imagination courts can see that divorcing parties, who own an apple orchard for instance, leave the courthouse with apples for life rather than a truckload each of applewood kindling.

We must be aware, for instance, of the importance of the family home in terms both of its emotional and financial value. I am concerned that the dominant financial value of the family home will cause inequities, and even forced sale, as a result of our adoption of equitable distribution. My concern is particularly aroused when I contemplate minor children, who are the innocent victims of their parents' inability to maintain the marriage. Our courts should bend over backward to maintain minor children with a custodial parent in the family home when appropriate. This can be accomplished under traditional child support (*Murredu v. Murredu*, 160 W.Va. 610, 236 S.E.2d 452 (1977)) and alimony (footnote one, *Patterson v. Patterson*, 167 W.Va. 1, 277 S.E.2d 709 (1981)) doctrines.

The sordid statistics about the impoverished state of women cited above should instruct us that in domestic relations a bird in the hand is worth several in the bush. Although the majority opinion does not express or imply a contrary conclusion, I should like to make the point explicitly and in no uncertain terms that, if either alimony or child support is to be part of the final order, trial courts should not force a sale of the marital house merely to split the proceeds unless the marital house substantially exceeds the reasonable needs of the wife and children. One convincing indication that the house substantially exceeds the

reasonable needs of the wife and children would be that the value of the use of the house exceeds any reasonable support obligation. Because a husband must support his children, and often his former wife, it is far better to order that he continue to pay the mortgage on the family house and provide it for his children and former wife's use than to leave these dependents waiting each month for alimony and child support checks whose delivery is so uncertain.

Similarly, where the marital surplus has been invested in an ongoing business that would be destroyed by withdrawal of the wife's proportionate share, courts should be open to compromises that allow the wife an interest in the ongoing business. The doctrine of equitable distribution should neither license nor excuse the destruction of golden-egg-laying geese.

Pension rights and insurance plans present a particularly challenging opportunity for this kind of creative solution. Investment in pensions and insurance is probably the largest slice of the investment pie. Today social security taxes, for instance, are almost fourteen percent of wages (although the employer pays half) which means that fourteen percent of an average wage-earner's salary is automatically "saved" for retirement, disability, and the protection of his survivors in the event of his death. In addition to social security are myriad company, union, and public employee pensions.

These programs are generally tied to the wage-earner in a family, and would therefore seem to be an asset ripe for redistribution under a court's equitable powers.[7]

7. Women, and particularly older women, often do not have any pension rights, because they either did not work, worked only intermittently, or did not work at jobs with pension plans. The following table illustrates this gap. The disparity is actually even starker than these figures would suggest, since women receiving the pensions of deceased husbands are counted as women "receiving pension."

EMPLOYEE PENSIONS FOR PEOPLE AGE 65 AND OLDER, 1976

| | Percent Receiving Pension | Median Annual Pension Benefit |
|---|---|---|
| WOMEN | | |
| All | 18% | |
| Public Employer | 9 | $ 2,750 |
| Private Employer | 9 | 1,340 |

EMPLOYEE PENSIONS FOR PEOPLE AGE 65 AND OLDER, 1976

| | Percent Receiving Pension | Median Annual Pension Benefit |
|---|---|---|
| MEN | | |
| All | 38% | |
| Public Employer | 13 | 4,830 |
| Private Employer | 25 | 2,060 |

*Working Women, Marriage and Retirement,* (working paper), President's Commission on Pension Policy (1980), citing statistics from *Social Security and the Changing Roles of Men and Women,* U.S. Department of Health, Education and Welfare (1979).

These statistics are unsurprising when viewed in light of the fact that, in 1981, half of the

However, pension rights present one of the most complex problems in equitable distribution cases. In most states, a husband's vested interest in a pension plan is considered marital property [8] but certain limitations exist.

The United States Supreme Court has decided that military retirement and railroad retirement are personal entitlements unavailable for distribution upon divorce. *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981) (military retirement); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) (railroad retirement). Additionally, a number of state courts have held that where the right is contingent or subject to divestment, the plan is non-contributory, or the present value of the pension unascertainable, the pension rights are not subject to division.[9]

Furthermore, even where rights are vested because cash contributions have been paid into an actuarily sound plan, it may nonetheless be impossible to withdraw the money to make an equitable distribution because of the terms of the plan. More frequently than not, pension contributions are mandatory for the period during which a person is employed in a particular firm and can be withdrawn only on termination of employment or retirement. Even where money can be withdrawn, such withdrawal may destroy the value of the pension or have oppressive tax consequences, and often there is no other money available to compensate a spouse in lieu of the money locked away in the pension plan.

An examination of the West Virginia Public Employees Pension Plan may illustrate the dimensions of those problems. This plan provides a pension based on two percent of an average of the high three years of salary for every year of qualifying service, with a reduced percentage available to a surviving spouse. *W.Va.Code*, 5–10–22 [1971] and *Code*, 5–10–24 [1961]. Public employees *must* be part of the plan and, while they work for the State, money cannot be withdrawn. *W.Va.Code*, 5–10–17 [1980]. Employees can receive their total contributions, without interest, if they leave state service and their estate can receive their contributions if they die before receiving back all actual contributions. *W.Va.Code*, 5–10–30 [1974]. However, the value of the pension if collected at the time of retirement in any individual case will often far exceed the fair market value of the employee's contributions in a private, actuarially sound, pension plan.

Consequently, courts may wish to avoid an immediate division of pension rights when making an equitable distribution of property if to do so would merely destroy for both parties a far greater future en-

43,000,000 women in the paid labor force were employed in only 20 occupations: Secretary, bookkeeper, salesclerk retail worker, cashier, waitress, registered nurse, elementary school teacher, private household worker, typist, nursing aide, sewer and stitcher, cook, receptionist, secondary school teacher, assembler, bank teller, building interior cleaner, hairdresser, cleaner and servant, and childcare worker. *Employment and Earnings* U.S. Dept. of Labor, Bureau of Labor Statistics, (1982). The majority of these occupations are not likely to be covered by pension plans.

**8.** The majority of equitable distribution jurisdictions say that pension rights are to be considered in arriving at a financial settlement; however, there is no single formula for how such consideration is to be applied. *See Monsma v. Monsma*, 618 P.2d 559 (Alaska 1980) (Alaska); *In re Marriage of Camarata*, 43 Colo. App. 317, 602 P.2d 907 (1979) (Colorado); *Husband B. v. Wife B.*, Del.Super., 396 A.2d 169 (1978) (Delaware); *Green v. Green*, Hawaii App., 599, 623 P.2d 890 (1981) (Hawaii); *In re*

*Marriage of Bodford*, 94 Ill.App.3d 91, 49 Ill.Dec. 633, 418 N.E.2d 487 (1981) (Illinois); *Wilson v. Wilson*, Ind.App., 409 N.E.2d 1169 (1980) (Indiana); *Ratcliff v. Ratcliff*, 586 S.W.2d 292 (Ky.Ct.1979) (Kentucky); *Ohm v. Ohm*, 49 Md. App. 392, 431 A.2d 1371 (1981) (Maryland); *Gibbons v. Gibbons*, 105 Mich.App. 400, 306 N.W.2d 528 (1981) (Michigan); *Jensen v. Jensen*, 276 N.W.2d 68 (Minn.1979) (Minnesota); *Vert v. Vert*, Mont., 613 P.2d 1020 (1980) (Montana); *Kruger v. Kruger*, 73 N.J. 464, 375 A.2d 659 (1977) (New Jersey); *Matter of Marriage of Franzke*, 51 Or.App. 35, 624 P.2d 632 (1981), aff'd., 292 Or. 110, 637 P.2d 595 (Oregon); *Bloomer v. Bloomer*, 84 Wis.2d 124, 267 N.W.2d 235 (1978) (Wisconsin). *See also*, Annot., 94 A.L.R.3d 176 (1979).

**9.** For instance: *Witcig v. Witcig*, 206 Neb. 307, 292 N.W.2d 788 (1980); *Delay v. Delay*, 612 S.W.2d 391 (Mo.App.1981); *Mueller v. Mueller*, 166 N.J.Super. 557, 400 A.2d 136 (1979).

titlement. Under such circumstances, a court should choose to provide equitable treatment for the wife through an award that will allow her to share in future benefits when they fully mature.

An analogue to the pension problem is found with respect to private insurance. Many middle income people have whole life insurance policies but their cash surrender values are negligible until people have reached comfortable middle age. A husband whose insurance policy is paid for with marital assets may on termination of the marriage eliminate the former wife's beneficiary status, as was apparently done in Mrs. LaRue's case. Where alimony is not a charge on a former husband's estate [10] the wife may then be left with nothing upon his death. Although the present cash surrender value of the policy may be negligible, its value as insurance (particularly if the husband is in poor health) may be substantial.

### III

The majority has elected to permit marital fault to affect a wife's recovery for her contribution of homemaking services. I believe this to be incorrect both legally and practically.

I trace our power to initiate what, in all candor, we must admit to be a distinct departure from all our previous holdings, to the authority reserved to us by the broad language of *W. Va. Code*, 48–2–21 [1969]. It is a construction of this provision defining "property" to mean marital property (as opposed to inherited property,

or property brought to the marriage) that forms the ground on which equitable jurisdiction may be built.[11] Defining "property" as marital property (or, more specifically, the "marital surplus") does not complete our task, however. We must further decide what activities should be considered as contributions to the marital surplus when the time comes for partition of the surplus. I agree with the majority's decision that homemaking services merit such consideration, but I believe that once that decision is made, the statute leaves us no room to interfere with recovery.

The right to recover from the marital surplus the proportionate share of one's contribution is a limited but unqualified right. It is limited, because *Code*, 48–2–21 [1969] authorizes only transfers based upon contribution or equitable ownership. We are not a community property state. A spouse is entitled under our statute to receive only the share of property acquired with the marital surplus to which his or her contribution to the marriage renders that spouse entitled. Once that entitlement has been established, however, the statute becomes directive. Because the statute mandates restoration, a spouse's right to recover his or her share should not be qualified by considerations of fault in the break-up of the marriage, relative wealth, needs of the children, or any other matter.[12] These are matters to be considered in the context of alimony or child support awards only, as provided in *W. Va. Code*, 48–2–16 [1969].

Apart from the fact that the fault rule does not follow from the statute that au-

**10.** Our position regarding alimony as a charge on a decedent's estate is outlined in *In re Estate of Hereford*, 162 W.Va. 477, 250 S.E.2d 45 (1978) where (to summarize very briefly) we concluded that alimony could be a charge on a decedent's estate where the terms of the property settlement permitted such a charge, and equity demanded it.

**11.** For instance, our holding does not empower courts to transfer title to any property acquired by either spouse before the marriage or after the marriage by gift of a third party or inheritance. These types of property are unavailable for distribution in this State not merely because we say they are not, but because of the express language of *Code*, 48–2–21 [1969] that mandates

*restoration* of property. Before property titled in the name of one spouse may be distributed to the other spouse, it must appear to the court that the property to be distributed is within the contemplation of *Code*, 48–2–21 [1969].

**12.** The rule that considerations of marital fault should have no impact on property distribution has been expressed by the courts of Maine and Illinois. *Boyd v. Boyd*, Me., 421 A.2d 1356 (1980); *In re Marriage of Cihak*, 92 Ill.App.3d 1123, 48 Ill.Dec. 428, 416 N.E.2d 701 (1981). But *see Smith v. Smith*, 5 Kan.App.2d 117, 612 P.2d 1257 (1980); *Murff v. Murff*, Tex., 615 S.W.2d 696 (1981), decided under different statutes.

thorizes our holding, the practical difficulties of applying a fault rule are manifold. To add the question of fault to the questions of quality of homemaking services and quantity of homemaking services that a court will already be called upon to decide will, I fear, muddy these waters hopelessly and render meaningful review impossible. More important, as I shall discuss at some length in the following section, it will blur and confuse the distinction between restoration and alimony at a time when this distinction most urgently needs clarification. To my mind, a "monetary award for homemaker services" based on fault and giving rise to no property rights is indistinguishable from alimony.

In syllabus point 2 of *Patterson v. Patterson, supra,* we concluded on the basis of our reading of *Code,* 48-2-21 [1969] that:

> Since the authority of a circuit court in divorce matters is entirely statutory, the court does not have power in a divorce action to transfer title to real property from one spouse to another either in lieu of or as a supplement to alimony or child support; ...

Our holding today should not disturb the distinction between recoupment and alimony that we maintained in *Patterson.* Under the statute, courts do not have power in a divorce action to transfer title to property from one spouse to another either in lieu of or to supplement alimony or child custody awards. The majority opinion suggests that courts nonetheless do have power to refuse to transfer title to property from one spouse to another in lieu of refusing alimony. I disagree. Equitable distribution of the assets acquired with the marital surplus is an enterprise conceptually distinct from the award of alimony or child custody payments, and should remain so.

Although the division of the marital surplus is fairly mechanical, the determination of the spouse' contribution is not. When the husband is a successful brain surgeon the wife's contribution to the marriage may amount to less than half of his income. Conversely, when he is an indolent slob it may amount to substantially more than half. In this latter case, however, the question of the ratio of distribution is likely to be mooted by lack of assets. While most divisions will likely end up very near equal, there are certain factors which other jurisdictions consider[13] and which we should commend to our courts to consider, in ascertaining a proper division. The proportionate share of a spouse should reflect:

(1) the length of the marriage;

(2) the occupation of the parties, whether each worked and for how long; and, where both parties worked, the respective contributions of each partner;

(3) the amount and sources of all income;

(4) the contribution of each party to the acquisition, preservation, appreciation, or dissipation of marital property, including services as a homemaker;

(5) the loss of inheritance rights in property acquired during the course of the marriage and the loss of pension rights; and

(6) the income tax consequences, if any, of property division.

Obviously, since this is a case of first impression, it is not possible to anticipate all of the considerations that we will ultimately be called upon to analyze. None-

---

**13.** The following cases include discussions of factors considered in arriving at an "equitable" distribution of marital property: *Makar v. Makar,* 398 So.2d 717 (Ala.Civ.App.1981); *Neely v. Neely,* 115 Ariz. 47, 563 P.2d 302 (1977) (no relation); *Valante v. Valante,* 180 Conn. 528, 429 A.2d 964 (1980); *Turpin v. Turpin,* 403 A.2d 1144 (D.C.App.1979); *Farias v. Farias,* 58 Haw. 227, 566 P.2d 1104 (1977); *Matter of Marriage of Thornton,* 89 Ill.App.3d 1078, 45 Ill.Dec. 612, 412 N.E.2d 1336 (1980); *Libunao v. Libunao,* 388 N.E.2d 574, *reh. denied,* 390 N.E.2d 695 (Ind.App.1979); *In re Marriage of Steenhoek,* Iowa, 305 N.W.2d 448 (1981); *Smith v. Smith,* 5 Kan.App.2d 117, 612 P.2d 1257 (1980); *McCallister v. McCallister,* 101 Mich.App. 543, 300 N.W.2d 629 (1980); *Viers v. Viers,* 600 S.W.2d 214 (Mo.App.1980); *In re Marriage of Owen,* Mont., 609 P.2d 292 (1980); *Kullbom v. Kullbom,* 209 Neb. 145, 306 N.W.2d 844 (1981); *Carr v. Carr,* N.D., 300 N.W.2d 40 (1980); *Price v. Price,* 591 S.W.2d 601 (Tex.Civ.App.1979); *Matter of Marriage of Rink,* 18 Wash.App. 549, 571 P.2d 210 (1977).

theless, in the inevitable hiatus between the initiation of litigation in the *nisi prius* courts and the ultimate, case-by-case development of rules through the appellate process, we should make some tenuous effort to anticipate the general contours of equitable distribution.

## IV

Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement on divorce. Therefore, where one expands, the other must recede.

Our past, narrow reading of *W.Va.Code*, 48–2–21 [1969] required us, in order to prevent injustice, to adopt an expansive view of the circumstances in which alimony was appropriate. In *Dyer v. Tsapis*, 162 W.Va. 289, 249 S.E.2d 509 (1978) we relaxed the traditional requirement that a showing of specified categories of fault was a prerequisite to any award of alimony, in favor of a rule that a showing of "inequitable conduct" on the part of a spouse would suffice. *Dyer, supra*, concerned alimony in a divorce predicated on voluntary separation under *W.Va.Code*, 48–2–4(a)(7) [1977]. In *Haynes v. Haynes*, 164 W.Va. 426, 264 S.E.2d 474 (1980), the rationale of *Dyer*, "that alimony is a way of avoiding unjust enrichment of either of the parties," *Haynes*, 164 W.Va. at 426–427, 264 S.E.2d at 475, was extended to apply to alimony in a divorce based on irreconcilable differences under *W.Va.Code*, 48–2–4(a)(10) [1977]. Most recently, in syllabus point one of *F.C. v. I.V.C.*, 171 W.Va. 458, 300 S.E.2d 99, (1982) we dropped all pretense of a fault requirement and concluded that "[a]limony may be awarded under *W.Va. Code*, 48–2–4(a)(7) against a faultless party if 'principles of justice' so require ..."

Clearly, now that economic and homemaking contributions are to be considered in the distribution of marital property, the likelihood of "unjust enrichment," *Haynes, supra*, 164 W.Va. at 428, 264 S.E.2d at 475, and the corresponding necessity of applying "principles of justice" *F.C. v. I.V.C., supra*, syl. pt. 1, may recede. In situations where there is no inequitable conduct shown, and both parties are adequately provided for after the distribution of the marital assets, remedial alimony is no longer appropriate. This does not, of course, mean that alimony is extinct in West Virginia. Where the division of the marital property does not provide an adequate result—for instance, if the marital property is insufficient—courts must still have resort to alimony to redress apparent inequity. It does, however, mean that alimony can be reduced to manageable proportions, and to its two ancient elements, fault and need.

No-fault redistribution of the parties' contributions, along with alimony and child support to address fault and need provide a clear and complete set of tools with which to address the financial aspect of divorce fairly, thoroughly, and comprehensibly. I admit that these are more rigid concepts than those of the majority, but it is only with rigid structural members that one can build—mush does not retain its shape.

## V

My final concern is the majority's relation of intra-marital gifts to the doctrine of equitable distribution. Although I am not violently opposed to a rule that considers gifts given by one spouse to the other during their marriage as set-offs against contributions to the marriage, such a rule is susceptible to abuse unless our doctrine of presumption of gift is clarified. To the extent that the majority wishes to consider only highly personal gifts, like a wife's jewelry or mink coat, I have no quarrel. Other types of property, however, like stocks and bonds require something beyond a gift analysis.

Our narrow construction that forbade equitable distribution of property acquired by joint efforts included a somewhat perverse presumption that any transfer of property between married persons is a gift. That presumption, obviously, confounds all human experience; it is far more reasonable to presume that the titling of marital property in the name of one spouse is an expedience, and that mutual benefit is intended. The spouse in whose name the property is titled presumably holds the property as if a trustee for the other spouse. It follows,

then, that upon the termination of a marriage the circumstances that justified titular ownership in the name of one spouse cease to exist, and the implicit expectations upon which the transfer was made are entirely confounded.

It is argued by Mr. LaRue in this very case that any transfers of money or property from Mrs. LaRue to himself were gifts and must be treated as such. We discussed the problem of presumed gifts in *Patterson, supra,* in the context of impressing a constructive trust on property titled in the husband's name but acquired by both husband and wife through joint business efforts:

.... Transfers between related persons can be challenged not only by the persons involved, but by third parties as well. The presumption concerning gift has its most forceful effect when a transfer is challenged by a third party, particularly after the death of one of the related persons. The court cannot be blind to the obvious fact that most married persons do not contemplate divorce throughout the entire course of a marriage, and that transfers of property between spouses [are] usually intended for the joint benefit of both. While we must retain the presumption of gift in order to avoid difficult third party claims (since spouses usually do intend to confer the benefit of property on their spouse in the event of their death), the presumption of gift is probably best rebutted in a suit between spouses by a clear showing of unjust enrichment. Most people do not intend unjustly to enrich the other man.

167 W.Va. at 11–12, 277 S.E.2d, at 716.

I believe that we should respond to Mr. LaRue's argument by raising the *dictum* of *Patterson* to a specific holding that the presumption of gift is eliminated, or at least qualified, as it applies at the time of divorce to intra-marital gifts of property of a non-personal nature. Of course, we should in no way weaken the continued vitality of the presumption of gift when the inter-spousal transactions are challenged by disgruntled children, greedy relatives, or creditors.

Human experience instructs us that married couples will not behave during the marriage as if divorce were imminent. Such a posture would enervate the cooperative spirit that is central to all successful marriages. We should presume that by entering into an arrangement such as that adopted by the LaRues a wife implicitly trusts her husband to acquire equity for their joint financial security—that her husband was intended not to be her donee, but her fiduciary. Consequently, it should require no torturing of the language of *Code,* 48–2–21 [1969] to conclude that where one spouse (usually the husband) has acted for the other in this presumed fiduciary capacity in the management of the family surplus the fiduciary must return his spouse's interest in property titled in his name when, upon divorce, his trust ends.

Notwithstanding our previous narrow holdings, *Code,* 48–2–21 [1969] plainly authorizes courts of equity to inquire into the circumstances surrounding the titling of family property in the name of one spouse. Furthermore, the statute clearly implies that if the court finds that assets earned by one spouse have been converted into property titled in the name of the other spouse, the assets should be restored to the spouse who originally earned or contributed those assets.

Therefore, with the above qualifications and elaborations, I concur in the majority decision.

HARSHBARGER, Justice, concurring:

I cannot find a logical reason to allow fault to affect a spouse's right to equitable distribution when the distribution is a compensation for homemaker services, and not to allow fault to be considered when the amount of equitable distribution is based upon economic contributions.

The majority opinion quite properly leaves intact our current law about alimony, the allowance or amount of which *does* depend in part upon degrees of fault or inequitable conduct.

It seems to me, however, that a spouse may have been an exemplary provider of homemaker services and thus entitled to

equitable distribution of the marital assets, and at the same time have been guilty of acts recognized to justify his or her spouse in getting a divorce. There is no more reason to penalize that spouse by reducing his or her share of the equitable distribution for homemaking, than there would be reason to reduce a share allotted to him or her because of economic contributions.

I would hold that equitable distribution applies for both economic contributions and homemaker services regardless of fault; and that in instances where there is blame, alimony (or reduction or denial thereof) would reflect punishment for the fault.