460 S.E.2d 710

**Catherine Ann DURNELL, Plaintiff Below, Appellee,**

v.

**Thomas A. DURNELL, Defendant Below, Appellant.**

No. 22658.

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1995.

Decided July 11, 1995.

Richard A. Bush, Bush & Trippel, Parkersburg, for appellee.

Robin Jean Davis, Segal and Davis, L.C., Charleston, for appellant.

PER CURIAM:

In this appeal from a divorce judgment, Thomas A. Durnell (appellant) claims that the Circuit Court of Wood County erred in awarding his former wife, Catherine Ann Durnell (appellee), rehabilitative alimony, in view of the fact that she was guilty of fault which contributed to the breakup of the parties' marriage. He also claims that the amount of rehabilitative alimony was unreasonably high, given the relative financial positions of the parties, and that the trial court erred in failing to reduce the amount of alimony after he suffered a sharp reduction in his income. He lastly claims that the circuit court erred in valuing the property subject to marital distribution. After reviewing the issues raised and the record presented, this Court cannot conclude that the trial court's alimony ruling was erroneous. On the other hand, the Court believes that there were errors in the valuation of property for marital distribution purposes. The judgment of the circuit court is, therefore, affirmed insofar as it relates to alimony, and it is partially reversed in certain particulars with regard to the marital distribution award.

Catherine Ann Durnell, who had been married to Thomas A. Durnell since July 9, 1976, instituted this divorce proceeding on August 27, 1991. In her complaint, she alleged that irreconcilable differences had arisen between the parties and that Thomas A. Durnell had engaged in cruel and inhuman conduct which had rendered further cohabitation unendurable.

After the institution of the proceeding, the parties entered into, and the court accepted, an agreed *pendente lite* order, whereby Thomas A. Durnell agreed to pay Catherine Ann Durnell temporary child support and alimony. The order also made certain other temporary arrangements and provided: "[n]either party shall alienate or encumber any marital property without the written consent of the other party. . . ."

In the months following the filing of the complaint, the parties entered into a number of stipulations, and extensive contested hearings were conducted by Ralph E. Troisi, a special commissioner. The hearings culminated in recommendations by Special Commissioner Troisi which were largely adopted by the circuit court after considering various exceptions interposed by the parties.

In his recommendations, the special commissioner found that even though Catherine Ann Durnell admitted to engaging in an extramarital affair, that action was condoned by the parties' resumption of marital cohabitation. He also found that the primary cause of the disintegration of the marriage was the fact that irreconcilable differences had arisen between the parties. The special commissioner recommended that Catherine Ann Durnell receive child support of $6,000.00 per month and rehabilitative alimony of $10,000.00 per month for ten years. The parties' marital property was valued at over $1,000,000.00, and Catherine Ann Durnell was found to be entitled to $410,180.86 from Thomas A. Durnell after offsets were made for various payments and distributions of assets already made. It was provided that this amount could be paid in installments.

After the submission of the special commissioner's report to the circuit court, Thomas A. Durnell, who had previously been privately engaged in the practice of medicine, closed his practice and joined a medical group as an employee. As a result, he suffered a substantial decrease in income. He, therefore, "moved" that the court award less alimony than recommended by the special commissioner. This "motion" was initially made as a "Motion for Modification of Agreed Pendente Lite Order and/or Final Order" filed on January 24, 1994. On February 11, 1994, a separate "Motion for Modification of Agreed Pendente Lite Order and/or Final Order Pursuant to Rule 60(b) of the West Virginia Rules of Civil Procedure" was filed. He also made various claims about the improper valuation of his former medical practice by the special commissioner.

Catherine Ann Durnell also petitioned the court to deviate from the special commissioner's recommended decision. She claimed that Thomas A. Durnell had wrongfully converted a securities account, referred to as the "Legg–Mason Securities Account," in violation of the non-alienation provision in the agreed *pendente lite* order. She prayed that

the court award her a sum to account for what her share of the account would have been worth if it had not been converted.

As previously indicated, the circuit court largely adopted the special commissioner's recommended decision. The court refused to afford Thomas A. Durnell the relief sought in his motions and essentially affirmed the special commissioner's recommendations on alimony and findings on the value of the medical practice. The court did, however, grant Catherine Ann Durnell the sum which she sought for Thomas A. Durnell's conversion of the "Legg–Mason Securities Account."

On appeal, Thomas A. Durnell first claims that the trial court erred in awarding his wife any alimony whatsoever. He claims that the evidence clearly shows that she was guilty of fault which should bar an award of alimony. The claim of fault is based on the fact that Catherine Ann Durnell admitted having an extramarital affair and the further fact that she engaged in conduct which disrupted his medical practice and caused him emotional distress.

The evidence adduced before the special commissioner included an admission by Catherine Ann Durnell that she had an extramarital affair in 1989. Although this testimony was not directly corroborated, there was some indication that she had discussed the affair with several persons. After the affair, the parties reconciled. Catherine Ann Durnell also admitted that she resumed the relationship in April, 1990, although this was not corroborated by the testimony of any witness.

Thomas A. Durnell claims that although the evidence of an extramarital affair could not support the award of a divorce because it was uncorroborated, it was evidence of cruelty and was fault contributing to the breakup of the parties' marriage. He claims that, in view of the fault, the trial court erred in awarding Catherine Ann Durnell alimony.

Other evidence was introduced showing that Thomas A. Durnell had a substantial medical practice and that he hired another physician, Dr. Sheila Stastney, to assist him. The evidence indicated that while Dr. Stastney was working in Thomas A. Durnell's office, Catherine Ann Durnell harassed her and ultimately forced her to leave. Thomas A. Durnell claimed that as a result of Dr. Stastney's departure, he suffered physical, mental, and emotional distress. He attempted to commit suicide twice, and his physician, Dr. Vincent J. Mazella, testified that he was working too many hours and that he could not endure the stress of the situation.

In his brief, Thomas A. Durnell argues that Catherine Ann Durnell's "conduct for the three (3) years immediately prior to the parties' separation certainly was a contributing factor to the deterioration of Appellant's physical and mental condition. This Court should not condone an award to Appellee of $10,000.00 per month for ten (10) years as rehabilitative alimony when her actions financially jeopardized Appellant's practice and severely jeopardized Appellant's emotional and physical well being."

Recently, in the case of *Rexroad v. Rexroad*, 186 W.Va. 696, 414 S.E.2d 457 (1992), this Court discussed at some length the effect of fault upon an alimony award. In that case, the Court recognized that in 1991 the West Virginia Legislature amended W.Va.Code § 48–2–15, relating to fault, and the Court, in essence, found that fault absolutely bars an alimony award in only three instances. The Court's conclusion was summarized in syllabus point 2, as follows:

W.Va.Code, 48–2–15(i) (1991), bars a person from alimony in only three instances: (1) where the party has committed adultery; (2) where, subsequent to the marriage, the party has been convicted of a felony, which conviction is final; and (3) where the party has actually abandoned or deserted the other spouse for six months. In those other situations where fault is considered in awarding alimony under W.Va.Code, 48–2–15(i), the court or family law master shall consider and compare the fault or misconduct of either or both of the parties and the effect of such fault or misconduct as a contributing factor to the deterioration of the marital relationship.

In the present case, although there were allegations, and even some evidence, that Catherine Ann Durnell had engaged in

adulterous conduct, there was also evidence that the conduct had been condoned and was not sufficiently corroborated to serve as a ground for granting a divorce. There was no evidence whatsoever that either party had been convicted of a felony or that abandonment or desertion had occurred for the requisite six months.

Under the circumstances, the Court cannot conclude that there was an absolute statutory bar to the circuit court's award of alimony to Catherine Ann Durnell.

■ As indicated by syllabus point 2 of *Rexroad v. Rexroad, Id.*, even though other circumstances constituting fault may not absolutely bar an award of alimony, the trial court may weigh those circumstances against the fault or misconduct of the other party. If, after weighing the comparative fault or misconduct, the court finds that one party was principally at fault and that the fault was a contributing factor to the deterioration of the marital relationship, the court may consider that circumstance in making an alimony award.

In the present case, the special commissioner specifically found:

> The primary cause of the disintegration of the marriage of the parties was the irreconcilable differences that existed between the parties as to the priorities of their lives. Plaintiff was not happy with what she saw as Defendant's excessive devotion to the accumulation of income and material goods, to the detriment of his personal relationship with Plaintiff. Defendant was not happy with his life with Plaintiff, and wanted to end his marriage. He wanted to develop new relationships with other people, including other women, which he subsequently did in a short period of time.

> Neither party has proven fault as a basis for this divorce.

After examining the record, we cannot conclude that the finding of the special commissioner, who was acting in lieu of, but also in the role of, a family law master, was improper or constituted any sort of abuse of discretion. Accordingly, under the principles in *Rexroad*, Thomas A. Durnell's assertion that Catherine Ann Durnell should be wholly denied alimony on the basis of fault is without merit.

In addition to claiming the circuit court erred in making any alimony award at all, Thomas A. Durnell claims, in the alternative, that the alimony was set at an unreasonably high figure and that the trial court erred in failing to reduce it when his financial situation deteriorated.

The evidence adduced during the hearing showed that in 1988 Thomas A. Durnell earned $458,991.00; in 1989 he made $492,-250.00; in 1990 the figure was $654,000.00; in 1991 it was $779,000.00; and in 1992 he earned $559,000.00. Over the five years, he had an average gross income of almost $600,-000.00 per year. It was further projected that for the year 1993, the year in which the commissioner rendered his report, Thomas A. Durnell would have a gross income of $918,108.00. There was also evidence that during the last three months of 1992 he had an adjusted net income of $271,000.00. On the basis of these figures, the special commissioner concluded that Thomas A. Durnell should pay Catherine Ann Durnell $10,000.00 per month in rehabilitative alimony for ten years, which was ultimately ordered.

The documents filed by Thomas A. Durnell suggest that in 1993, after the taking of all evidence in the case and after the special commissioner had completed and submitted his report to the circuit court, Thomas A. Durnell closed his private practice of medicine and accepted employment with a medical group which ultimately paid only $225,-000.00 to $250,000.00 per year, as opposed to the average of almost $600,000.00 per year that he made in private practice.

On appeal, Thomas A. Durnell claims that for the year 1993 his net income, before personal taxes, was $16,740.73 per month and that this clearly was inadequate to cover the almost $20,000.00 per month in alimony, child support, and other payments which he was required by the circuit court to make to Catherine Ann Durnell. He further claims that requiring him to make payments in that amount provides him with no personal income whatsoever.

The evidence submitted during the actual hearings conducted prior to the time the special commissioner rendered his report all dealt with the income which Thomas A. Durnell earned while in private practice. In fact, as previously indicated, he did not leave the private practice of medicine until after the special commissioner rendered his report.

Specifically, it appears that after the special commissioner rendered his report, Thomas A. Durnell left the private practice of medicine and on January 24, 1994, filed a petition to modify the special commissioner's alimony determination. On February 11, 1994, he also filed a similar motion. In support of his motions, he submitted an affidavit and the employment agreement which he entered into with Parkersburg Women's Center, P.C.

The trial court conducted a hearing on March 3, 1994, at which the court pressed counsel about the preparation of a final decree in the divorce matter. The apparent purpose of that hearing was to wrap up the "loose ends" connected with the matter. At that hearing, counsel for Catherine Ann Durnell stated:

> [T]hey have filed a Petition for Modification already and asked that you hear it, and it is scheduled also to be heard by the law master on the 9th. So that is their side of it.

The court responded:

> I am not going to hear a Petition for Modification. I never do. That is not my job.

On April 21, 1994, the trial court rendered the final judgment in the matter, the judgment from which Thomas A. Durnell now appeals.

■ Recently, in *Stephen L.H. v. Sherry L.H.*, — W.Va. —, — S.E.2d — [1995 WL 87940] (1995), this Court reviewed the role of a circuit court in a divorce proceeding where the evidence is taken by a family law master. In that case, the Court concluded that the family law master has a statutorily mandated fact-finding responsibility and that the circuit court's statutory role is one of review. The Court further ruled that the circuit court's review role did not encompass *de novo* review; rather, as stated in syllabus point 1:

> A circuit court should review findings of fact made by a family law master only under a clearly erroneous standard, and it should review the application of law to the facts under an abuse of discretion standard.

In reaching its conclusion on the alimony award in the present case, it appears that the circuit court reviewed the findings of the special commissioner in light of the evidence before the special commissioner and essentially concluded that the findings of fact were not clearly erroneous and that the special commissioner's application of the law to the facts did not constitute an abuse of discretion. What the circuit court did was what the Court considers appropriate and proper under the principles in the *Stephen L.H.* case. Although it is true that the present case involved a special commissioner rather than a family law master, the functional role of the special commissioner was that of family law master.

■ For the circuit court to have considered the evidence relating to Thomas A. Durnell's change in circumstances in assessing the propriety of the special commissioner's recommendation on alimony would have required a *de novo* consideration of the facts and underlying alimony question, something which a circuit court may not properly engage in under West Virginia's present statutory divorce scheme.

■ It appears to this Court that the trial court's final order relating to alimony, which adopts and confirms the special commissioner's conclusion, was consistent with the evidence adduced before the special commissioner, and the Court cannot conclude that the rehabilitative alimony award was excessive in light of that evidence.

The Court, of course, has recognized that a trial court has the authority to modify a judgment or decree of alimony, once alimony has been granted. *See McVay v. McVay*, 189 W.Va. 197, 429 S.E.2d 239 (1993), and W.Va.Code § 48–2–15(e), which states, in relevant part:

At any time after the entry of an order pursuant to the provisions of this section, the court may, upon motion of either party, revise or alter the order concerning the maintenance of the parties, or either of them, and make a new order concerning the same, issuing it forthwith, as the altered circumstances or needs of the parties may render necessary to meet the ends of justice.

By concluding that the circuit court did not err in making the alimony ruling in the present case, the Court is not saying that Thomas A. Durnell does not have a factual basis to support a modification or that he does not have the right legally to pursue modification in a separate proceeding. The Court is saying that, given the procedural posture of the case at the time the change in circumstances occurred, the trial court did not err in refusing to consider evidence not before the special commissioner and in refusing to consider the alimony question in a *de novo* manner.

Thomas A. Durnell also claims that the trial court erred in valuing certain assets of the parties which were subjected to equitable distribution. Specifically, he challenges the valuations placed upon his medical practice and upon a certain securities account owned by the parties.

In the course of the trial of this case, a number of witnesses indicated that Thomas A. Durnell's medical practice had four principal categories of assets: (1) land, buildings, and improvements; (2) furniture, fixtures, and equipment; (3) accounts receivable; and (4) cash on hand. The special commissioner found that the actual values of these components of the practice were as follows: (1) land, buildings, and improvements, $67,191.00; (2) furniture, fixtures, and equipment, $106,080.00; (3) accounts receivable, $253,348.01; and (4) cash on hand, $110,781.99.

Thomas A. Durnell does not challenge the court's treatment or valuation of the land, buildings, improvements, furniture, fixtures, or equipment. He does challenge the value placed by the trial court on the accounts receivable and the inclusion of the cash on hand in the valuation of the medical practice for equitable distribution purposes.

In calculating the value of the medical practice, John W. Reynolds, an expert called by Thomas A. Durnell, testified that it was a generally accepted accounting procedure to discount accounts receivable. He stated that the discounted value of the accounts receivable component of the Durnell medical practice was $253,348.51.

In valuing the medical practice, the circuit court accepted the discounted value and included accounts receivable at $253,348.51. On appeal, Thomas A. Durnell does not challenge the discount value, but he claims that the discount value, in effect, did not take into consideration taxes which had to be paid out of the accounts receivable after they were actually received. He claims that ultimately taxes in the amount of $102,000.00 will be attributable to the receipt of the accounts receivable and that he should be entitled to a credit for the taxes which he will have to pay. He, in effect, claims that the circuit court, by not making an allowance for taxes payable on the accounts receivable, gave Catherine Ann Durnell a windfall of approximately $51,000.00, or one-half of the $102,000.00 in taxes which he had to pay on the accounts receivable.

Thomas A. Durnell also claims that the trial court erred in including cash on hand in valuing the medical practice. He claims that the rule in this State on the valuation of a closely held business for marital distribution purposes indicates that the distribution should be based upon the net value of the business rather than the gross value of the business. He argues that although his medical practice did have substantial cash on hand, it also had current expenses such as salaries, rent, utilities, malpractice premiums, payroll taxes, and the like, and he states that the circuit court, in valuing the practice and including the cash on hand, made no reduction for the current expenses. He states that, in effect, the circuit court awarded Catherine Ann Durnell a share of the gross value of the cash on hand (and consequently of the practice itself) rather than its net value.

Thomas A. Durnell claims that the cash on hand should either have been offset by

monthly expenses payable and all yearly accruing expenses of the business or, in the alternative, that the cash on hand should have been wholly excluded from the calculation of the practice's value. He points out that Catherine Ann Durnell's own expert, Donald R. Conley, acknowledged that a reduction would have to be made on the value of the practice for all the "obligations to pay salary, rent, utilities, malpractice premiums, payroll taxes, etc."

Thomas A. Durnell argues that the correct valuation of his medical practice should have included $67,191.00 for land, buildings, and improvements, $106,080.00 for furniture, fixtures, and equipment, and $151,348.00 for accounts receivable less taxes attributable to those accounts. He further claims that the cash on hand should have been reduced to its net value or excluded from the valuation. He argues that the total value of the practice for marital distribution purposes should have been $324,619.00 rather than the value placed upon it by the circuit court.

■ In syllabus point 2 of *Tankersley v. Tankersley*, 182 W.Va. 627, 390 S.E.2d 826 (1990), this Court stated:

> For purposes of equitable distribution, W.Va.Code, 48–2–32(d)(1) (1984), requires that a determination be made of the net value of the marital property of the parties.

In the body of *Tankersley*, the Court discussed what is meant by "net value." The Court said:

> The concept of "net value" is rather simple when a court is valuing a single asset which has a valid lien or encumbrance. In these situations, the net value equals the fair market value of the property less the amount of any lien or encumbrance. We alluded to this equation in Syllabus Point 3, in part, of *LaRue v. LaRue*, 172 W.Va. 158, 304 S.E.2d 312, 41 A.L.R.4th 445 (1983): "In computing the value of any net asset, the indebtedness owed against such asset should ordinarily be deducted from its fair market value." This is also the general rule elsewhere—in computing the net value of an asset, the first step is to establish its market value and then deduct the amount of any valid lien or encumbrance on the property.

182 W.Va. at 629, 390 S.E.2d at 828.

■ In the present case, the overall issue is not the valuation of a single asset, but a complex asset, a medical practice composed of a number of discrete assets—land, buildings, improvements, furniture, fixtures, equipment, accounts receivable, and cash on hand. The special commissioner and the circuit court appropriately, in this Court's view, determined that the complex asset, the medical practice, should be valued by aggregating the values of the sub-assets, or components, of the complex asset. In going through this process, the special commissioner valued each simple, sub-asset.

■ While, as just indicated, this Court believes that this was an appropriate approach, the Court also believes that when such an approach is utilized, the simple, sub-assets should be valued in accordance with the net-value rule as set forth in *Tankersley*. When this approach is used, it is necessary that any valid lien or encumbrance against any given sub-asset be deducted from the market value of the sub-asset.

■ Unpaid taxes are rather clearly a valid lien or encumbrance against accounts receivable, or will become such a lien or encumbrance as soon as the accounts receivable are collected, and the Court believes that if the trial court did fail to give Thomas A. Durnell credit for taxes ultimately payable on the receipt of the accounts receivable, the trial court erred.[1] In view of this circumstance, the judgment of the circuit court must be reversed insofar as it failed to consider a factor for income taxes due in the future on the accounts receivable, and the case must be remanded for recomputation of the business value, taking the tax factor into consideration.

■ Somewhat similarly, since the trial court adopted the approach of aggregating

---

1. It appears from the record that the value placed on the accounts receivable was for "adjusted" accounts receivable. It is not absolutely

clear from the record what the adjustment was for, although the Court suspects that the adjustment was for noncollectible accounts receivable.

the value of the subcomponents of the medical practice to determine the overall worth of the practice, the trial court erred in failing to deduct from the value of the practice expenses payable on the valuation date. While the Court does not believe that Thomas A. Durnell should have been left with all the cash on hand in the practice, Catherine Ann Durnell should have been awarded only one-half of the cash on hand, as offset by the current expenses payable by the parties on the valuation date, and on remand such expenses must be factored into the net value of the medical practice for marital distribution purposes.

■ Thomas A. Durnell's last claim involves a security account owned by the parties. This account is referred to as the "Legg–Mason Securities Account."

Counsel for the parties stipulated into the record on September 3, 1992, that Catherine Ann Durnell should be awarded the account, which was worth $131,787.63. After the parties entered into the stipulation, Thomas A. Durnell transferred the securities out of the account and utilized them for ongoing business expenses. It appears that, in so doing, Thomas A. Durnell violated the agreed *pendente lite* order provision stating:

> Neither party shall alienate or encumber any marital property without the written consent of the other party, which consent shall not be unreasonably withheld....

The trial court indicated that the liquidation of the account was in violation of the parties' agreed undertaking and acted to deprive Catherine Ann Durnell of the appreciation which would have accrued had the account remained intact. The trial court concluded that, given the existence of the violation of the agreement, and given the fact that the violation, in effect, deprived Catherine Ann Durnell of property, it was appropriate that the account be valued at what it would have been worth if the account had not been converted in violation of the *pendente lite* order.

West Virginia § 48–2–32 provides that, ordinarily, in a marital distribution situation, the marital property of the parties should be divided equally. West Virginia Code § 48–2–32(c)(4), however, provides that a trial court (or family law master) may deviate from equal distribution where one party has dissipated or depreciated the value of the marital property.[2]

It is apparent that the trial court in the present case was confronted with a dissipation situation in Thomas A. Durnell's treatment of the "Legg–Mason Securities Account," and what the court attempted to do was to restore Catherine A. Durnell to the position she would have been in if no dissipation had occurred.

Although this Court believes that the trial court rather unartfully treated the matter in the final ruling, given the evidence of dissipation, and given the powers granted to a trial court by W.Va.Code § 48–2–32, the Court cannot conclude that the trial court's ruling on the "Legg–Mason Securities Account" was erroneous or should be reversed on appeal.

For the reasons stated, the judgment of the Circuit Court of Wood County is affirmed, except insofar as it relates to the valuation of the appellant's medical practice. The judgment is reversed on the valuation of the medical practice and the case is remanded for the trial court to conduct such proceedings as may reasonably be necessary to compute the income taxes potentially payable on the accounts receivable and to compute the expenses payable on the valuation day of the medical practice. The trial court is ordered to recalculate the net value of the medical practice to reflect said taxes and expenses, and, after determining a new net value for the medical practice, to recompute the parties' marital distribution shares.

---

**2.** West Virginia Code § 48–2–32(c) provides, in relevant part:

In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action, after a consideration of the following:

\*　　\*　　\*　　\*　　\*　　\*

(4) The extent to which each party, during the marriage, may have conducted himself or herself so as to dissipate or depreciate the value of the marital property of the parties....

Affirmed in part, reversed in part, and remanded.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired J., and FOX, Judge, sitting by temporary assignment.